## PERKINS & a. *v.* MATHES.

In aid of the construction of a will, regard is to be had to the situation and
circumstances of the testator, his family and relatives, and the nature,
amount and situation of his property.

Having regard for these considerations, the construction depends upon the
intention of the testator, to be ascertained from a full view of everything con-
tained within " the four corners of the instrument."

The words of a will must be taken in their ordinary, popular signification,
unless there is something in the context or subject matter, clearly indicat-
ing a different use of the terms employed.

A testator is to be considered as intending a benefit to the object of his gift.

With few exceptions, (indicated in the opinion of the court) extraneous evi-
dence is not admissible to control, vary or effect the terms of a will.

The terms " all my books and papers of every description," *held* to include
promissory notes, payable to the testator.

A specific legacy is not subject to contribute to make up any unexpected de-
ficiency which may arise in regard to the other portion of the estate.

It is the duty of an Executor to transfer the thing specifically bequeathed, to
the specific legatee, on demand.

An Executor can maintain a suit in his representative capacity, only in the
case where the judgment, when recovered, will be assets of the estate.

ASSUMPSIT, for money had and recieved, brought by John Perkins
and another, Executors of Martha Cheswell against Benjamin
Mathes, to recover the amount due on five promissory notes, signed

by the defendant, payable to Martha Cheswell, or order, amounting in value to about eight hundred and fifty dollars, including interest. Plea—the general issue, with a brief statement. The plaintiffs produced the notes, and the signatures were admitted. The defendant introduced a certified copy of the will of Martha Cheswell, dated July 2, 1863,—proved Aug. 14, 1867. The seventh clause is as follows; " I do give and bequeath unto Benjamin Mathes, Jr., of said Newmarket all my books and papers of every description." The eighth clause was, " I do give and bequeath unto the Congregational Society, in said Newmarket all the interest accruing on all my deposits in the Savings Bank for the county of Strafford, at Dover, N. H., to be paid to them from year to year and every year from the time of my decease by my executors, free from every expense or deduction, so long as said society shall remain in existence, and public worship shall be maintained in the meeting house of said society, according to the usages and customs of the Orthodox Congregational faith and creed—temporary interruptions not to be noticed or have any effect to abrogate this bequest. And I will and order that said deposits shall not be removed or withdrawn from said bank by my executors, nor said legacy varied except by consent of all parties interested therein."

The testatrix by her will also gave to Frances A. Mathes and Ann E. Mathes, daughters of Benj. Mathes, all her household furniture, and to C. B. Mathes, a son of said Benjamin, one half the house and land where she lived and other lands and buildings adjoining, on condition that he pay out to another legatee one hundred dollars. The plaintiffs are residuary legatees and gave bond to pay debts and legacies. More than half the testatrix's property passed under the residuary clause. The testatrix left an estate valued at about eleven thousand dollars, mostly in real estate. She held at her decease two small notes against John W. Smart, one of the plaintiffs but had no other notes except those in suit. She had about four hundred dollars in the Savings Bank for the county of Strafford, and about one hundred and fifty dollars in Newmarket Savings Bank— having one or two deposit-books in the former, and one or two in the latter bank. She left two large Bibles, one of which contained a family record; a Concordance; Doddridge's Family Expositor; Fleetwood's Life of Christ; Burnett's Life of Sir Matthew Hale; and some twenty other books, mostly, if not wholly, of a religious character; also, bundles of tracts, some unbound periodicals and some newspapers; all of little pecuniary value. The only written books or pamphlets which she left were one or more old writing books with copies, none of them whole; a book containing a few memoranda of payments of money, and perhaps one receipt; a little thin paper-covered book with something written in about the Bible, perhaps three or four leaves left in it—and a small book containing (in forty-five pages) the Journal of a Committee appointed by the town of Newmarket in 1777, to procure the resignation or dismissal of a minister. The journal was kept by Wentworth Cheswell, Clerk of the Committee, and a father of the testatrix.

Benjamin Mathes, Jr., is a son of the defendant, and a great nephew of the testatrix. The plaintiffs are her nephews. Benjamin Mathes, Jr., testified that the present action was prosecuted without his consent; and that after Martha Cheswell's death he made a separate demand on each executor for the notes in suit, and her bank-books. The plaintiffs' objected to all of the defendant's evidence on the ground that the defendant cannot set up against the executors in this action a title to the notes in Benjamin Mathes, Jr., but the objection was overruled, subject to the plaintiffs' exception. The plaintiffs also contended that the clause in the will under which. Benjamin, Jr. claimed, does not convey the notes. The defendant offered to show that Martha Cheswell, since making her will, had declared her intention that Benjamin Mathes, Jr., should have the notes in suit. The plaintiffs offered to show that Martha Cheswell, since making her will, had declared to one of the plaintiffs that her purpose was that the money arising from the notes in suit, and the money due from the banks should be used to extinguish the legacies, so that the real estate should not be trenched upon. Both offers were rejected, subject to exception. The plaintiffs asked the scrivener who wrote the will " whether when he took her directions for writing the will she said anything, and if so what, as to a journal that had been kept by her father, which she thought the family would like to preserve" —but the question was excluded, subject to exception. It appeared that the executors in July or August, 1867, made a demand on the defendant, for lawful interest on the notes.

Neither party desiring to go to the jury on any question of fact, a verdict was directed for the plaintiffs, subject to the defendant's exception.

*Small*, for the plaintiffs.

*Hatch*, for the defendant.

Foster, J.   The general rules of construction applicable to wills are quite simple and clearly defined.   Mr. Jarman's rules (2 Jarman on Wills, p. 762 *et seq.*) " have acquired," says Judge Redfield," in some degree the weight of authority."   See, also, 1 Redfield on Wills, page 419 *et seq.*, ch. 9, sec. 4.

In common with all general rules, considerable discretion is required in their application to particular cases; but in the present instance, we think we shall not be obliged to attach a strained and extraordinary sense to any words or form of expression adopted by the testatrix, in order to give full affect to her probable intention.

This intention is to be gathered from the will itself, in all its parts; but, in aid·of our discovery, we may also take into account all the circumstances surrounding the testatrix, such as the nature and amount of her property and its situation, as well as the situation and circumstances of her family and relations.   1 Red. on Wills, 426. *Trustees* v. *Peaslee*, 15 N. H. 319; *Tilton* v. *Tilton*, 32 N. H. 263. *Goodhue* v. *Clark*, 37 N. H. 525.

If, as in the present case, a doubt is suggested as to the meaning expressed or the effect intended by the terms of a particular bequest or devise, the clause of the will in question is not to be conclusively interpreted as an isolated, detached and independent provision, but the intention is to be "ascertained from a full view of everything contained within the four corners of the instrument." 1 Red. on Wills 435; *Carter* v. *Carter*, 1 Ves. 169, *Wickham* v. *Turner*, 2 Dowl. & Ry. 398; *Biles* v. *Hopkinton*, 5 Q. B. 223; *East* v. *Twyford*, 31 Eng. Law & Eq. 62; *Hall* v. *Chaffee*, 14 N. H. 215; *Hall* v. *Hall*, 27 N. H. 287.

It is also a familiar rule of construction that the words of a will must receive their usual and ordinary popular signification, unless there is something in the context or the subject-matter clearly indicating a different use of the terms employed. 1 Red. on Wills 438. As an illustration of this rule, it has been held that a bequest of *money* must be taken in its *ordinary* signification; but, under that term, stock in the public funds or private corporations will pass where there was *no money* upon which the bequest could operate. *Chapman* v. *Reynolds*, 6 Jur. N. S. 440.

Another familiar rule is, that a testator is to be considered as intending a benefit to the object of his gift; *Wallace* v. *Wallace*, 23 N. H. 149.

The books are full of examples of the construction of words in a will, and courts are called upon every day to say what property passes under a doubtful expression, in such an instrument; but the language of the Lord Chancellor, in a recent case, presents the difficulty of determining such questions by reference to authorities. "Upon the construction of wills, he says, we are not much assisted by reference to cases, unless the will, or the words used are very similar. If this is not so, they are more likely to mislead than to assist in coming to a correct conclusion. The object of construction is to ascertain the intention of the testator, which is to be collected, not from isolated passages, but from the whole of the will, and the grand scheme and scope of it. And first, what is the *ordinary* meaning of the expressions used by the testator? If the meaning of the words he has used is clear, they must be adopted, whatever the inclination of the court may be." 1 Red. on Wills 442.

In the will now before us, what passes by the terms, "all my books and papers of every description?" The literal meaning of these terms is broad enough to include, not only the Bible and other religious works—the tracts, pamphlets, manuscripts, memorandum, &c., described in the inventory of the estate, but also the account books of the deceased, her promissory notes, bonds, certificates of stock or of deposits, and other evidences of debts due to her; and these would probably be held to carry and transfer, as incident thereto, the property, moneys, rights and choses in action of which such papers are the representative. In commercial usage, and to a very great extent in common parlance, all such securities as notes, bonds, certificates, bills of exchange, drafts, &c., are included under the denomination of "paper."

But that the terms " books and papers," in this will, were used in a sense less comprehensive, is manifest by reference to that part of the context which contains a specific bequest to the Congregational Society, of the interest upon the money in the Savings Bank at Dover.   The testatrix could not have intended to give to one legatee the deposits in the bank, and to another the worthless *certificate* of deposit; for although in terms she gives to the society the interest only, upon the deposits, yet, by other terms in the same clause, the principal is placed within the absolute control of it, and by implication of law, it belongs absolutely to the society.   The unqualified gift of the *income* of a fund confers an absolute, and not merely a life interest in the principal, unless a contrary intention of the testator clearly appears.   *Blair* v. *Bell*, 13 Eng. L. & Eq. 188 ; *Doe d. Guest* v. *Bennett*, 6 Exch. 892 ; *South* v. *Alleine*, Salk. 228.   A gift of the interest of £1000 is tantamount to an absolute bequest of the capital.   *Humphrey* v. *Humphrey*, 6 Eng. L. & Eq. 113 ; *Andrews* v. *Boyd*, 5 Greenl. 199 ; *Adamson* v. *Armitage*, 19 Ves. 416 ; Co. Lit. 4, *b;* *Craft* v. *Snook*, 2 Beasley (N. J.) 121.

It is manifest, therefore, that the money in the Savings Bank at Dover did not pass to Benjamin Mathes, Jr., under the bequest of books and papers.

This fact alone — independent of any consideration as to the ordinary acceptation of the terms, which might have different significations, among different classes of men, in different communities—renders the expression " books and papers " of doubtful meaning, and calls upon us to examine the will with reference to the other bequests, and to look at the situation of the testatrix, and the various objects of her bounty.

But, first, we will refer to a few cases of interpretation of doubtful expressions, in instances somewhat analagous to the present.   We shall find that bonds, bank stock, deposit notes and promissory notes have often been held to pass under the term " moneys " in a will. 1 Jarman on Wills, 612 ; *Morton* v. *Perry*, 1 Met. 446 ; *Manning* v. *Purcell*, 31 Eng. L. & Eq. 452 ; *Fulkerton* v. *Chitty*, 4 Jones' Eq. 244, " China," under the term furniture ;" *Hale* v. *Gilbert*, 2 Ves. 430 ; " All the rest of my worldly goods," includes land not specifically devised.   *Wright* v. *Skelton*, 23 Eng. L. & Eq. 509.

A testator domiciled in England bequeathed " all the property I shall leave in the colony."   It was held that this bequest included a promissory note made by a resident at the cape.   *Scorey* v. *Harrison*, 17 Eng. L. & Eq. 46.   A devise of " all my goods," passes the testator's notes, bonds, money, &c.   *Anon.* 1 P. Wms. 267 ; *Locke* v. *Noyes*, 9 N. H. 432 ; " A bond is *bona notabilia*, in the diocese where it is," 1 Rolle Abr. 909 ; *Moore* v. *Moore*, 1 Bro. Ch. 128 ; 2 Wms. on Exrs. 748.   And under a bequest of all the testator's " *clothes* and other property, goods and articles, belonging to him at the time of his death," it was held that the words " property, goods. and articles " were not to be confined to articles *ejusdem generis* with clothes.   *Everall* v. *Brown*, 1 Smale & Gifford's Ch. 368, 17 Eng. L. & E. 369.

Now let us look at the context of this will and the circumstances of the case.

The testatrix possessed an estate of about eleven thousand dollars, consisting mostly of lands. More than one half of her entire property went to the plaintiffs, her nephews, under the residuary clause of the will, even if they were not to have the avails of the notes in suit. The remainder of her property, except the legacy to the Congregational Society and another legacy of one hundred dollars, is divided among her relatives, all of whom are somewhat remote of kin. She had three nephews, — the two plaintiffs and Benjamin Mathes. To the plaintiffs, she made the valuable devise and legacy above named. All the rest, except the legacy to the society and the other small bequest, was divided among the children of the other nephew, the grand-nephews and grand-nieces of the deceased. To Frances and Ann, sisters of Benjamin Mathes, Jr., she gave all her household furniture; to C. B. Mathes, his brother, one half the house and land where she lived, and other lands and buildings adjoining, subject to an unimportant condition. All these gifts were valuable and substantial. To Benjamin Mathes, Jr., she gave all her " books and papers of every description."

Now taking this whole will together, and examining it by the light of the testator's situation and relation to all these parties, was it or not her intention to use the term " books and papers " in the limited sense which the plaintiffs say attaches to them? Is any reason apparent for so remarkable and decided a preference for all the other parties standing towards her in the same relation of kindred? Or is it probable, as the plaintiffs contend, that the testatrix considered the gift of the Bible, tracts, newspapers, &c., of more *real* worth than the mere *pecuniary* value of the other legacies, and that she regarded this bequest as " the most valuable bequest she could make to a young man just engaging in the business of the world?" Upon the whole, we are of the opinion that the more general and extended construction of the terms " books and papers " should be adopted; not only because the literal phraseology includes the notes in suit, and because such construction is consistent with authority in analogous cases, but also, because, in our judgment, it comports naturally with the probable intention of the testatrix, who seems to have endeavored to enlarge a narrow interpretation by adding the phrase " of every description."

The Bible is, unquestionably, the " best of books;" but it is very common, and does not command an extravagant price in the market. The other books are not rare, and possess very little pecuniary value; and the manuscript of forty-five pages, being " the journal of a committee appointed by the town of Newmarket in 1777 to procure the resignation or dismissal of a minister," notwithstanding the journal was kept by the great, great uncle of the legatee, would not, we think, be considered as more advantageous to a young man just starting in business, than a substantial *pecuniary* legacy.

But it is contended by the plaintiffs that the intention of the testa-

trix was in accordance with their claim to these notes, as manifested by declarations made by her, since making her will, to the effect that her purpose was that the money arising from the notes and the money due from the banks, should be used to extinguish the legacies; so that the real estate should not be trenched upon. The plaintiff offered to shew such declarations to one of themselves; and they also proposed to ask the scrivener who wrote the will, what, if anything, the testatrix said, " as to a journal that had been kept by her father, which she thought the family would like to preserve."

On the other hand, the defendant offered to show that the testatrix, since making her will, had declared her intention that Benjamin Mathes, Jr., should have the notes in suit.

All this evidence was very properly rejected. The general rule of the common law that parol evidence is not admissible to control, change, vary or affect any written instrument, applies as well to *wills* as to deeds and written contracts. 2 Jarman on Wills 762. This rule is subject to the exception, that, in equity, where a certain presumption would, in general, be deduced from the nature of an act, such presumption may be repelled by extrinsic evidence of a different intention. Presumptions of law or equity may be repelled by parol testimony, for they only prevail where there is no evidence to rebut them. *Stabit presumptio donec probetur in contrarium.* Peak's Ev. 113; *Loring* v. *Woodman,* 41 N. H. 396.

The only other exception that occurs to us, is where the extrinsic evidence is offered to remove a latent ambiguity, arising from words equally descriptive of two or more subjects or objects of gift, and to rebut a resulting trust. 2 Jarman on Wills 762; 1 Red. on Wills 426 note; 2 Red. on Wills 521 note.

Under the first of these exceptions, it was held that declarations of the testator made before the making of the will were admissible to rebut the legal presumption that interlineations were made subsequent to the execution. *Shalloross* v. *Palmer,* 16 Q. B. 747; but that subsequent declarations *respecting such alterations* were inadmissible. And in *Hampshire* v. *Pierce,* 2 Vesey 217, where in a doubtful designation of four children of the testatrix, she having four children by one husband and two by another, and where the question was to what particular children a legacy of three hundred pounds was given, Sir John Strange said: " It would be proper to admit an explanation of this, what were the four children meant. But as to the three hundred pounds, whether the evidence goes to that or not, I will not give weight to it, for there the devise is so expressed as to take in the whole of the children. Whatever her intention might be is another question. I cannot go out of the will to admit it."

But, with the exceptions alluded to, the rule applies that no declarations of the testator whether prior or subsequent to the execution of the will, are admissible to control, vary or explain the terms used in the instrument, 1 Red. on Wills, 426, 427, 436, 437; *Hubbard* v. *Hubbard,* 15 Q. B. 227.

And the declarations of the testator explanatory of his intention,

made by him *in extremis,* were held inadmissable in *Lowfield* v. *Stonham,* 2 Strange 1261.

If, as we have determined, the notes in suit passed to the legatee, under the bequest of books and papers, it follows that the plaintiffs cannot maintain this suit.

The legacy to B. Mathes, Jr., was *specific;* and it was the duty of the executors to transfer these notes *in specie* to the legatee upon demand. 2 Red. on Wills, 584. A pecuniary legacy is usually regarded as *general,* but this is a bequest of the notes or "papers" themselves, and not of the avails or other equivalent of them. And they are not subject to contribute to make·up any unexpected deficiency that might arise with regard to any other portion of the estate, 2 Red. on Wills, 557–459, and notes 2 & 3 ; *Ibid.* 462 ; *Stephenson* v. *Dawson,* 3 Beav. 342 ; *Wallace* v. *Wallace,* 23 N. H. 149 ; *Loring* v. *Woodward,* 41 N, H. 394.

The suit is not brought by the executors to recover, for the benefit of the legatee, from a person wrongfully detaining it, the thing bequeathed, but, themselves retaining the thing bequeathed, they bring the action for the purpose of withholding the specific thing and its avails from the legatee.

Executors can sue in their representative capacity, only in the case where the judgment, when recovered, will be assets of the estate, which, as we have seen, cannot be, in the case of a specific legacy. 2 Red., 183, 184.

*Verdict set aside.*